Opinion

per curiam:

This case involves a claim against the United States referred to this court by the Congress arising out of the alleged used by the Air Force without payment of compensation of a colored camouflaged parachute, an automatic firing circuit for guns, an oxygen warning wiring *814 system for aircraft, and a bracket mounting to be used in attaching arming solenoids, developed from certain designs and specifications which, although unpatented, were alleged to have been submitted to the Air Force by the claimant here, Frederick P. Fulmer.
On April 4, 1958, Donald E. Lane, the trial commissioner of this court to whom this case had been referred, having conducted a trial in this matter, filed his report as to the facts and a recommended conclusion, which are hereinafter set forth, and adopted by the court. Based thereon, and upon consideration of the record made here, it is concluded and reported to the Congress that the claimant is neither legally nor equitably entitled to recover, and that any sum allowed would be in the nature of a gratuity.
This opinion, together with the findings of fact and conclusion, which follow, will be certified to the Congress pursuant to House [Resolution 229, 84th Congress, 1st Session.
It is so ordered.
FINDINGS OF FACT
1. On May 17, 1955, the House of Representatives, 84th Congress, 1st Session, adopted House Resolution 229. A copy thereof, together with a copy of H. R. 5630 and a copy of House Report No. 519, was transmitted to this court. The text of H. Res. 229 is as follows:
RESOLUTION
Resolved, That the bill (H. R. 5630) entitled “A bill for the relief of Frederick P. Fulmer”, together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.
The text of H. R. 5630 is as follows:
*815 A BILL
For the relief of Frederick P. Fulmer.
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Frederick P. Fulmer, of Trussville, Alabama, the sum of $25,000. The payment of such sum shall be in full settlement of all claims of the said Frederick P. Fulmer against the United States arising out of the unauthorized use by the Air Force of a colored camouflaged'parachute, an automatic firing circuit for guns, an oxygen warning wiring system for aircraft, and a bracket mounting to be used in attaching bomb arming solenoids, developed from certain designs and specifications which were submitted to the Air Force by the said Frederick P. Fulmer during World War II and subsequently used by the Air Force without his consent: Provided, That no part of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.
The claim identifiéd in the resolution and bill is the claim set forth in claimant’s petition. House Eeport 519, which accompanied H. Ees. 229, states—
$ * $ $ $ This resolution is merely to refer H. E. 5630, a bill for the relief of Frederick P. Fulmer, to the United States Court of Claims for the findings of fact and report its conclusion to the Congress. * * *
2. The sections of the United States Code under which the resolution was referred to the court are as follows:
The Court of Claims shall have jurisdiction to report to either House of Congress on any bill referred to the court by such House, except a bill for a pension, and to render judgment if the claim against the United States represented by the referred bill is one over which *816 the court bas jurisdiction under other Acts of Congress. [28 TJ. S. C. § 1492]
$ Hs ❖ H* *
Whenever any bill, except for a pension, is referred to tiie Court of Claims by either House of Congress, such court shall proceed with the same in accordance with its rules and report to such House, the facts in the case, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy.
The court shall also report conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant. [28 U. S. C. § 2509]
3. Claimant’s petition was duly filed in this court on September 16, 1955, and claims the sum of twenty-five thousand dollars ($25,000) for the alleged use of defendant of four unpatented inventions disclosed to the National Inventors Council during 1943. The defendant’s answer denies that claimant was the “inventor” of any of the four devices charged to have been used, denies use by defendant of any device disclosed to it by claimant, and denies that defendant ever agreed with the claimant to use any of the devices or to compensate claimant for submitting disclosures thereof. Additional defenses are asserted in defendant’s answer.
4. Claimant, Frederick P. Fulmer, is an individual residing in Birmingham, Alabama. The unpatented inventions claimed by Mr. Fulmer are (I) a colored parachute, (II) an automatic firing device for trailing sights for guns, (III) an oxygen warning wiring system for aircraft, and (IV) a bracket for mounting solenoids to the bomb bay of a bomb rack.
5. Claimant in the present suit was claimant in two prior suits in this court which concerned parachutes. The first was a suit on an unpatented invention for camouflaging parachutes, FuT/iner v. United States, 111 C. Cls. 591, dismissed June 1, 1948. The second was a suit for alleged infringement of copyright design cc’G 13752 on a colored *817 parachute, Fulmer v. United States, 122 C. Cls. 195, dismissed April 8, 1952. The present claimant also submitted a claim for $25,000 to the claims division of the General Accounting Office on February 19, 1951, for the alleged infringement of his “rights” in a colored or camouflaged parachute. This claim was denied by the Comptroller General of the United States on April 19,1951.
6. The present case has proceeded through full trial on the merits during which claimant, represented by counsel, presented evidence at a trial session held in Birmingham, Alabama, for the convenience of claimant, and defendant presented proofs at a trial session held in Washington, D. C. The evidence includes copies of voluminous correspondence between the claimant and the National Inventors Council and other Government agencies. The trial and report of this case have been delayed by a necessity for claimant to obtain substitute counsel.
(I) COLORED parachute
7. In claimant’s petition he alleges that he invented “a colored parachute” and that he disclosed the same “to the Army Ordnance Department in Birmingham, Alabama”, on April 12, 1943, and on the same day, at the alleged recommendation of the latter, he allegedly sent a disclosure thereof “to the National Inventors Council.” Sometime “thereafter” claimant allegedly communicated with the United States Air Force presumably with respect to the same idea but there is no allegation of disclosure to the Air Force at the time of that undated communication. Thereafter claimant allegedly granted to a Mr. Wade Koontz, of the Air Force, authority to inspect an application for patent on a colored parachute, filed in the Patent Office by claimant. Claimant next asserts that said patent application, which is not identified, was withdrawn in September 1950 because he had been granted copyright protection. It was upon the foregoing allegations that claimant alleged that said colored parachute “was used by the United States Army in World War II.” Claimant’s petition does not state whether the alleged use was pursuant to an agreement or whether the alleged use was unauthorized. H. R. 5630 states, with re *818 spect to this subject matter, that the claimant’s claim arises out of the “unauthorized use by the Air Force” of a colored “camouflaged” parachute allegedly “developed from certain designs and specifications which were submitted to the Air Force” by claimant “during World War II and subsequently used by the Air Force without his consent.”
8. Claimant testified in 1957 that he started working on a colored or camouflaged parachute about 1930; that his method was to color or camouflage a parachute for the purpose of using it for signals and camouflaging; that in 1931 or 1932 he sent to the National Advisory Committee for Aeronautics a drawing of an airplane with a parachute attached to the top of the airplane; that he talked to an Air Force reserve officer about it in 1938 or 1939, and that he corresponded with the Ordnance Department at Birmingham, Alabama, in March 1943 concerning colored camouflaged parachutes. Claimant presented no evidence, documentary or otherwise, to corroborate his above testimony.
9. On December 19, 1941, claimant and one E. C. Todd, his brother-in-law, jointly telegraphed the President that they had invented and designed a scheme to eliminate the loss of planes. On December 26, 1941, the National Inventors Council acknowledged said telegram, indicated desire to receive full details, and forwarded to claimant a copy of its information bulletin on how inventors may aid national defense. The National Inventors Council was and is an agency in the Department of Commerce which receives ideas and suggestions relating to national defense and then transmits them to the proper defense department if the Council considers them to be of value in a defense program. National Inventors Council Information Bulletin No. 1, revised March 1941, states—
*****
Serving as a clearing house for suggestions or inventions relating to the national defense, the Council will act in an advisory capacity to the War and Navy Departments with respect to such suggestions and inventions as may be submitted to it. All defense ideas, suggestions, and inventions submitted will be evaluated by technical experts and transmitted to the proper authorities.
*819 The submission to the National Inventors Council, under the provisions contained herein, of any description, drawing or other data pertaining to an invention is solely for the purpose of determining its military or naval value. Its acceptance by the Council does not legally obligate the United States Government or act as an estoppel under the patent statutes.
ífc ifc ^
No patent or other rights are secured by submitting suggestions or inventions to the National Inventors Council. * * *
$ Í* 'i'
The Council has no authority to consider the question of compensation for the use of a suggestion or invention by any Government Department or agency. Should an invention be utilized, the matter of compensation will be referred to the Executive Department of the Government making use of the product embodying the invention. Final settlement for the acquirement of rights can then be arranged between the inventor and the appropriate official of the Department making the purchase.
The amount of compensation can be considered only after tender of the suggestion or invention, and its adoption by an executive branch of the Government. The creation of the Council does not in any way affect the existing laws or practices of the Government Departments as to compensation.
# ❖ ❖ $ *
Additional information about the National Inventors Council is set forth in Information Bulletin No. 2, published in 1941.
10. On April 10, 1943, the National Inventors Council advised claimant that all of his suggestions had been examined by a technical staff and that none of them appeared suitable for use in the armed services. The correspondence indicates that claimant on March 25, 1943, claimed that he had already submitted 14 ideas, but no evidence was presented to describe what these ideas involved.
11. On April 12, 1943, claimant wrote to the National Inventors Council, stating in part — •
You will find enclosed herein specifications for a color scheme for parachutes, which I submitted to the Ordnance Department. * * *
*820 The complete specification, but without the notary public certificate, is reproduced here—
SPECIFICATIONS EOR PARACHUTE
1. A parachute comprised of the proper materials manufactured according to U. S. Government specifications.
2. A parachute comprised of the present-day designs.
3. A parachute comprised of the present-day mechanism thereto.
4. My invention is comprised of coloring and camouflaging scheme machine coloring, also Kitz Vat Dye coloring.
5. The purpose of coloring said parachute is to eliminate being detected when leaving the Airplane coming down to the ground.
I reserve the right to alter and amend said invention.
[signed] Frederick P. Fulmer
12. On May 20,1944, the National Inventors Council wrote to claimant as follows:
# * * # *
Your proposal for a Camouflaged Parachute received the full consideration of our technical staff and they inform me that the plan is known to, and appreciated by, appropriate military personnel some time prior to your presentation. In this connection, your attention is invited to paragraph 5 of the accompanying circular.
It is our opinion that this invention is not being used by either a government agency or the War Department. There is no evidence to show who may have originally invented such a device, or the precise nature of the invention. It is certain that the War Department has no knowledge of the letter you previously wrote on the subject and under these conditions we consider that you are not entitled to compensation.
I trust this will make clear to you the position of the Council.
13. On April 17,1944, claimant filed in the United States Patent Office an application for letters patent on a camouflaged parachute. The specification of the patent application included the following statement by claimant:
* * * The invention consists in the use of various colored material in the manufacture of the standard parachute as now used. * * *
*821 The claims of claimant’s patent application included claims to parachutes of standard design colored red, green, yellow, blue, royal blue, gray, shy blue, brown or tan, as well as to parachutes colored a plurality of colors or colored in circular bands, perpendicular sections, checkerboard or zigzag display of plural colors. The application did not include drawings. In rejecting claimant’s patent application, the Patent Office examiner held:
* * * The use of colors in various combinations and in selected patterns and designs for the purpose of camouflage, or for improving visibility, as the case may require, is old and well known, particularly as applied to military equipment. Color schemes have been applied to mobile equipment, including warships, trucks, tanks, aircraft, etc., as well as to clothing, buildings, and similar objects. Therefore, the application of any given color scheme to any one type of military equipment, including parachutes, is not considered inventive. The pattern selected is but a matter of choice to meet a particular requirement, producing no unobvious result, and particularly in view of the Cox reference, which teaches that a color scheme may be applied to any type of military equipment, and clearly does not limit itself to the uniform shown. * * *
The Cox reference mentioned in the Patent Office rejection quoted above is U. S. Patent No. 1,139,642, issued May 18, 1915, to Albert S. Cox. This early patent fully taught the idea of making military equipment such as uniforms, blankets, arms, tents, etc., less easily visible by using irregular areas or stripes of contrasting light and dark colors. The examiner’s rejection was affirmed by the Board of Appeals of the United States Patent Office. The Board’s opinion stated:
* * * Applicant admits that the art of camouflage dates back at least twenty-five years and that parachutes have been used for a long time, but argues that his invention resides in the application of camouflage to parachutes. We are in full agreement with the Examiner that to apply the art of camouflage to parachutes is not invention but the obvious extension of the art to an article that is desired to be rendered less visible. If it is desired to render a parachute invisible we considered it well within the skill of a mechanic to resort to the art of camouflage. * * *
*822 Claimant then abandoned his application for patent by failing to file a transcript of record to support an appeal to the United States Court of Customs and Patent Appeals.
14. On June 24, 1948, claimant filed in the United States Patent Office an application for design letters patent, the subject matter being “design for colored camouflaged parachutes.” The application drawing showed two views of an open parachute having irregular areas of various colors. This design application specification stated:
* * * *
The characteristic features of my design reside in the various colors and degrees of the canopy or a camouflaged colored parachute of the character shown in which the design of the colors and panels alternate in strict relation, as best shown in the drawing.
# # :Ji * ❖
In rejecting claimant’s application for design patent, the Patent Office examiner held:
* * * Also, the shape of the parachute shown herein is substantially conventional and since applicant has, throughout the prosecution of this application, stressed the camouflaging ornamentation on the top of the parachute, attention is again directed to the vari-colored surfaces represented on umbrellas, military uniforms, and the like. The Cox mechanical patent was made of record to show that this idea has been used in the camouflaging of military uniforms. In view of this fact, it would not seem to involve any more than ordinary ability or skill to apply vari-colored camouflage to the upper surface of a parachute as shown in the drawing of this application. * * *
Claimant’s application for design patent became abandoned for lack of prosecution by applicant’s failure to respond to the Patent Office rejection of March 20, 1950.
15. On September 7,1949, claimant registered in the Copyright Office a claim to copyright in a work of art or design for work of art, registration No. cc’G 18752, class G. The certificate of copyright registration issued to claimant without any examination as to any novelty or merits in the subject matter. It was upon this registration of a claim to copyright that claimant filed the second suit noted in finding 5 above, dismissed by this court in 1952.
*823 16. On July 10, 1944, claimant sent a copy of bis patent application, Serial No. 531,500, to Tbe Commanding Officer, United States Army Quartermaster Corps, Jeffersonville, Indiana, and proposed to assign his rights therein to the Government for the sum of $50,000. Claimant’s settlement proposal was rejected in a letter to claimant dated September 4, 1944. On September 8, 1944, Wade Koontz, Special Patent Advisor, Headquarters, Army Air Force, requested the claimant to furnish a “Power to Inspect and Make Copies” of the full Patent Office file on claimant’s pending patent application. In October 1948, some four years later, claimant provided Mr. Koontz with such a power to inspect and make copies of patent application Serial No. 531,500, and of his later filed design patent application Serial No. D-147,167. Claimant was repeatedly advised during the period 1944-1949 that in order to determine whether the Government used equipment within the scope of possible patent coverage, it would be necessary to be advised of the claims in an issued patent or the claims officially allowed by the Patent Office in a pending application. None of claimant’s patent application claims relating to colored or camouflaged parachutes were ever allowed by the Patent Office, and none ever issued in patent grants to claimant. Claimant was also advised that his registration of a drawing under the Copyright Act in no way affected the Government’s position in rejecting his claim for compensation.
17. The evidence presented by claimant at the trial of this case is clearly insufficient to warrant a finding that any colored or camouflaged parachute was used by the Government as the result of any suggestion ever made by claimant.
18. The evidence presented at the trial warrants a finding that the colored or camouflaged parachute suggestion, transmitted by claimant to Government personnel, did not involve patentable invention. Claimant’s suggestion amounted to a simple idea obvious at the time of transmittal to any person having ordinary skill in the parachute art. The art of camouflage for military equipment was well developed many years prior to the claimant’s suggestion that parachutes be camouflaged.
*824 19. Section 2509 of Title 28, United States Code, under which House Resolution 229 was referred to this court, requires a report of facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy. The oral and documentary evidence in this case establishes that claimant’s petition herein was not “filed within six years after the [alleged] right of action first accrues” and that claimant presented no evidence of a legal disability or otherwise as to why, if at all, the bar of the statute of limitation should be removed. The action of this court on claimant’s prior suits for compensation on the parachute suggestion is noted in finding 5 above.
(XU) AUTOMATIC EIRING DEVICE
20. In claimant’s petition he alleges that he invented “an automatic firing device for trailing sights for guns” and that he disclosed the same to the National Inventors Council. Claimant’s uncorroborated testimony was to the effect that he discussed his automatic firing device with “Army personnel” while employed by Bechtel-McCone-Parsons, aircraft manufacturer, in the early part of 191¡3, and that he then “figured out a plan by fitting a screen, a radar screen, guns would automatically be fired by means of relay in conjunction with computer circuit * * The earliest documentary evidence describing claimant’s automatic firing device appears to be a copy of a disclosure by claimant forwarded via The Honorable Laurie C. Battle, House of Representatives, and the Chief of Legislative Liaison, to the National Inventors Council in January, 1952. This disclosure includes a “specification” and three wiring diagrams. Pertinent portions of the specification read as follows:
% * # # #
The present invention relates to a method comprised of a trailing sight, together with a wiring diagram and mechanism thereto. A further object of this invention is to install this wiring diagram system and sight so as to make the sight a complete automatic firing mechanism, to be used in conjunction with aircraft gun, anti-aircraft gun, or machine gun, or other type military *825 fire arms. The main object of said invention is to give the operator more time to look after the mechanism of the firing equipment. * * *
I claim: 1. A wiring diagram and method comprised of a trailing sight known or recognized as radar or photo cell control, thus as soon as the objective appears m the trailing sight it will close the various relay mechanism and therefore make the gun firing automatic mechanism. * * * 5. A wiring diagram circuit to be used in conjunction with a radar screen or photo screen for trailing sights for the purpose of energizing the circuit on the gun solenoid circuit and making the gun automatically operated. In other words, with this proposal, when you set your sight, as soon as the objective appears in the gun sight screen, the guns will automatically reproduce the firing mechanism without the operator using any firing trigger control button or otherwise.
The three diagrams attached to claimant’s specification are vague and incomplete. The specification and the diagrams submitted by claimant do not constitute a complete or workable disclosure of an invention, but merely outline some broad objectives without specific details for the accomplishment thereof. A letter from the National Inventors Council to Congressman Battle, dated January 17, 1952, advised that the objectives outlined in claimant’s disclosure were well known to experts in the armed services, and that any worthwhile contribution must necessarily involve information on new automatic control apparatus and techniques.
21. On February 6, 1952, claimant supplemented his description of his automatic firing device by forwarding to the National Inventors Council a disclosure form together with a description of a “modification applied to a radar trailing sight controlled box, with a schematic section of the internal connection within the radar screen controlled box.” On this disclosure form claimant stated that the idea of an automatic firing circuit had not been “disclosed to other agencies or branches of the government.” Claimant also acknowledged that he understood that said “disclosure does not involve a protection of my rights nor does its acceptance by the Council provide any assurance that patentable features exist.” By letter dated February 16, 1952, claimant forwarded a further amendment to his previous disclosure, *826 and by letter dated April 19, 1952, claimant forwarded still further comments to National Inventors Council. By letter dated April 28, 1952, the National Inventors Council advised claimant as follows:
$ $ * $ # Frankly, the brief descriptive material you have supplied on this subject fails to disclose any features of novelty. As you undoubtedly realize, the general concept of employing photoelectric and. radar equipment for the purpose of providing automatic antiaircraft fire has been known and studied by the Armed Services for • a period of years. Any substantial contribution in this field must necessarily involve specific details as to the actual equipment which is involved rather than the mere presentation of an oversimplified schematic drawing.
* # * * *
On June 2, 1952, the National Inventors Council wrote claimant—
* * * M: #
All the submitted material on this subject [a firing mechanism for aircraft guns] has received the careful consideration of appropriate members of our technical staff. They report that it is apparent from the available material that you have only a general concept rather than a specific proposal. The descriptive material embodies no new ideas which would warrant reference to the Armed Services for further study.
22. Claimant testified that he had no patent on his automatic firing circuit. No proofs have been presented which would show that any branch or agency of the Government used or intended to use claimant’s firing circuit. Witnesses for the Government denied knowledge of any use and denied any promise, oral, written, or implied, of compensation to claimant for his submission of ideas on automatic firing circuits. The evidence presented furnishes no basis for the allegation of use “during World War II” or “subsequently”, as alleged in IT. E. 5630, or of use from 1950 to 1955 as alleged in claimant’s uncorroborated testimony. The evidence of record reveals no basis, either legal or equitable, for compensating claimant for the submission of general and vague ideas relating to automatic firing circuits for guns.
*827 (in) OXYGEN WARNING WIRING SYSTEM!
23. Claimant’s petition alleges that he invented an oxygen warning wiring system for aircraft; that he disclosed this invention to the Army Air Force on September 13,1943; that it was referred to the National Inventors Council, and that said invention was copied and used on B-26J and B-26S aircraft made in 1954. Claimant does not have a patent on this alleged invention. At the trial, claimant described his oxygen warning device as follows:
******
Q Now Mr. Fulmer, directing your attention just a moment to your oxygen warning device, will you explain to the Commissioner please what this device is, what it consisted of and the purpose it was designed to serve ?
A It was an automatic circuit for oxygen control warning system. It is comprised of different stations on the plane such as the tail gunner and the waist gunner and the radio compartment, the nose gunner and the bombardier and the control was in the pilot and co-pilot compartments and this system was installed on the ships so that pilot and co-pilot could tell in his compartment that the oxygen was running low in the tail gunner’s or nose gunner’s or in the bombardier’s compartment, con-, sisted of different locations on a board showing each different compartment with automatic control system being a system to show by lights on and off flickering as to the oxygen content of each station on the ship. *****
24. Claimant further testified that he prepared specifications and drawings of his warning system and sent them to the National Inventors Council and to Wright Field. Documentary evidence indicates that claimant forwarded a description of “wiring device for oxygen indicating light circuits for airplane” to the National Inventors Council on July 6,1943. The description included a single sheet of schematic wiring and a single page specification reading as follows:
Specification of a Wiring diagram for oxygen indicating light circuits for airplane
No. 1 Power to Fuse Box
No. 2 Fuse Box
No. 3 Fuse Link
No. 4 Wire to Oxygen indicating light on instrument
*828 No. 5 Indicating oxygen instrument with dial numbering from 1 to 400. When the oxygen pressure gets to 95 to 100 the indicating light will go on this ene[r]gizing wire No. 6 supplying current to 7
No. 6 Lead Wire furnishing current to light No. 7
No. 7 Light socket installed for 24 volt current
No. 8 Ground side of socket which complete circuit
No. 5 This instrument installed in pilot compartment
No. 7 Lights installed in bombardiers compartment radio waist gunner tail gunner bomb bay cat walk etc.
This is an indicating light warning system showing that oxygen pressure is down to 95 at which time all the lights in the various different departments will go on this warning to the user of the oxygen that pressure is getting low.
The purpose using a wiring diagram such as described will save expensive instruments labor and material, also receive the same benefits under the present day equipment used on plane.
25. The written description of July 6, 1943, and the oral description given at the trial session February 25, 1957, by claimant, differ in that thei 1943 written description relates to a system for indicating at all stations in the aircraft that the oxygen pressure is down to 95, and the 1957 oral description relates to a system for indicating in the pilot’s compartment the oxygen content at each of the other compartments in the aircraft. The system disclosed in 1943 to the National Inventors Council comprises a series of seven remotely installed lamps connected together to a single oxygen pressure indicator for simultaneously lighting when the oxygen pressure gets down to 95. The system described in 1957 at the trial provides flickering lights at different locations on a board visible to the pilot to tell the pilot in his compartment that the oxygen is running low in another compartment or compartments.
26. At the trial claimant attempted to prove use of his oxygen warning wiring system by offering a portion of page 42 of Popular Mechanics magazine for December, 1945. Claimant testified that he had seen planes during 1944 having his oxygen warning system, and that he then noticed the Popular Mechanics magazine. The magazine clipping shows a panel of “buttons which light up when oxygen supply to any crewman gets low”, and also shows a dial to indi *829 cate both, oxygen flow and oxygen pressure. The magazine clipping contains no wiring or circuit diagram, and does not constitute evidence that the Government used the wiring circuit disclosed by claimant either in 1944 aircraft or in the accused B-26J and B-26S aircraft made in 1954. There is no evidence in the record of this case to support or warrant a finding of fact that the Government ever used claimant’s oxygen warning wiring system.
27. The record includes copies of over 150 letters between claimant and various Government agencies and personnel concerning the oxygen warning wiring system and other alleged inventions. Claimant was advised by the Army Air Force in 1943 that “the warning system you propose is not applicable and would offer no improvement over the present oxygen system installed in airplanes of the Army Air Forces.” Following this 1943 rejection, claimant initiated many written requests for reconsideration and compensation over a 10-year period. These requests were directed to Wright Field, National Inventors Council, Senator J. H. Bankhead, Senator Lister Hill, Headquarters Army Air Force, Senator John Sparkman, General Hoyt S. Yanden-burg, United States Army Air Force, Wright-Patterson Air Force Base, and related to claimant’s oxygen warning wiring system and various other alleged inventions. Claimant’s requests were acknowledged in due course by refusals to adopt claimant’s ideas, and by denials that the Government was using any of claimant’s ideas.
28. In one or more of the claimant’s letters he alleged use of his oxygen warning system on B-24 airplanes. This allegation was apparently investigated and use was denied in letters from the Army Air Force to Senators Bankhead and Hill on June 26, 1944, to Senator Sparkman on June 16, 1948, to Congressman Battle on February 3, 1949, and to Congressman Huddleston on March 23, 1955. In letters to claimant, the Office of The Judge Advocate General, Department of the Air Force, and the National Inventors Council denied any use of, or novelty or military value in, claimant’s suggested oxygen warning system.
29. The trial of this case produced no proof that the Government ever used claimant’s unpatented oxygen warning *830 system, and no proof that there was ever any agreement with claimant, oral, written or implied, of intended use or of a promise in any way by the Government or any official thereof to compensate claimant for the submission of a suggestion or idea having no military value. The evidence of record reveals no basis, either legal or equitable, for compensating claimant for the submission of general vague ideas relating to oxygen warning wiring circuits and systems.
(IV) BRACKET FOR MOUNTING SOLENOIDS TO THE BOMB BAT OF A BOMB RACK
30. Claimant’s petition alleges that he invented a bracket “to be used for mounting the Solenoids to the bomb bay of the bomb-rack”, that this bracket was submitted to the National Inventors Council in 1943, and that it was used by the United States Air Force on its B-26 J and other aircraft. A solenoid is an electromagnetic device which may be connected to pull a safety wire from the fuse mechanism of a bomb. At the trial, claimant described this bracket as follows:
# Hi # ❖
Q Mr. Fulmer, directing your attention now to your bracket, first tell the Commissioner the proper name for it.
A Well it is a bracket and mounting for arming solenoid.
Q Is that s-o-l-e-n-o-i-d ?
A That is right, and it is mounted in the bomb bay for the purpose of pulling the nose and tail fuses of bombs.
Q, What do you mean by pulling ?
A Your arming mechanism, sets it off, to explode it.
Q Arming the fuse so it will operate.
A That is right, when you drop the bombs.
31. Claimant further testified that he prepared specifications for this bracket and sent them to National Inventors Council in 1943. Documentary evidence indicates that claimant on June 14,1943, forwarded to National Inventors Council a specification relating to nose and tail fusing for airplanes. This specification refers to a plate upon which a solenoid is mounted, and reads as follows:
*831 SPECIFICATIONS FOR NOSE AND TAIL FUSING FOR AIRPLANE
1. Wire to nose or tail fusing bombardier fuse box.
2. A complete cap and connector with contact pin to Solenoid and mechanism.
3. Lock nut is to tighten Solenoid on plate.
4. Solenoid mechanism and contact pins for pulling fuse wire from the bombs.
5. Lay-out of plate showing complete description of size and measurements.
6. Position of Solenoid mounted on plate.
I. When Solenoid is mounted to plate and lock nut tightened, then plate is mounted to bomb racks or stands with bolts.
8. Lay-out plate with machine-cut holes to mount Solenoid on said plate, provided with Yi" holes to mount on bomb racks or stands.
9. Solenoid mounted to plate with a lock nut, said Solenoid mounted right or left vertical or at an angle to plate.
10. My invention will save the following materials and labor:
20 cannon plugs complete with contact pins
80 — Ys" bolts
80 — Ys" nuts
80 — Yi" rivets
20 — íy2 x 4%" aluminum strips
Labor — $20.00 per airplane
11. Claim as my invention the specifications from 1 to 10 a plate with machine-cut holes, a Solenoid mounted on plate, said Solenoid mounted at angle or vertical, plate mounted to bomb rack, or stand, right or left, right side up, or upside down.
12.I reserve the right to amend said invention without departing from the spirit of my invention.
32. On June 22, 1943, the National Inventors Council replied to claimant that no advantage in his method of nose and tail fusing could be seen, and that re-evaluation would be made if claimant cared to send a complete description including drawings. On July 13, 1943, claimant forwarded another one-page “specification” for nose and tail fuses for airplane, together with a schematic wiring diagram. On September 18, 1943, National Inventors Council replied to claimant as follows:
*832 Your suggestion relating to a nose and tail fusing for airplanes has been carefully examined by our Technical Staff and by experts in the Army Air Force. A portion of the report thereon is quoted immediately below:
“The subject invention is of no value to the Army Air Forces. Its scope is covered by existing equipment, namely, the bomb shackle Type B-10 and/or the bomb arming control Types A-2 and B-2.
“It is assumed that Mr. Fulmer must have been [sic] a B-24 equipped with separate arming controls for nose and tail fuzes, in view of the description of the wiring system he proposes. This is required only on airplanes allocated to one of the Allied Nations to meet requirements for the bombs used by that Nation. Since for even such airplanes the invention is not applicable, the wiring and parts savings claimed are not possible.”
In view of the above, we cannot further consider your proposal at the present time. We shall, however, retain the material carefully classified and file for reconsideration should future conditions warrant.
It is desired to thank you for the opportunity to examine the proposal.
33. On September 20, 1943, claimant forwarded National Inventors Council a drawing accompanied by a letter stating—
I acknowledge receipt of your letter of September 18th. There appears to be some mixup between my two inventions and drawings.
I enclose Drawing No. 1, my invention showing layout of plate and solenoid mounted to plate, then the plate is mounted by screws to bomb rack, the solenoid could be fastened by means of lock nut on back of plate, thus eliminating #7 and #9 on Drawing No. 2, which is the method now being used, on A2 and B2 shackle. I am positive of the saving afforded by using my method of nose and tail fusing and will be glad to demonstrate a model and prove it will save the material and labor listed in my specifications sent you on June 14th. By comparing Drawings 1 (my invention) and Drawing 2 (method now being used) it can readily be seen the improvement of my method over the one now being used.
With reference to the wiring diagram for nose and tail fusing, my method was just to combine the nose and tail fusing under one circuit instead of using the two circuits, which are now being used.
*833 I earnestly request that you give these drawings your consideration in the light of the foregoing and awaiting with interest your early reply, I am,
The drawing showed a layout of a flat plate 3% inches by 4% inches having five 14-inch holes along opposite sides and having a solenoid secured to the plate by a lock nut. It is not apparent from the letter or the drawing how claimant proposed to mount such a plate on a bomb rack. On October 7, 1943, claimant sent National Inventors Council the following letter:
This will acknowledge receipt of your letter of October 1st.
I am employed at Bechtel-McCone-Parsons, Birmingham, Ala. as precision electrical installer and have a Civil Service rating granted by the Army Air Corps. In this position I work constantly with the planes that are now being used by the United States, as well as our Allied Nations and have in this way received the knowledge I have passed on to you with reference to Drawing No. 2 sent you with my letter of September 20th.
I have had a model made up, which I am mailing you under separate cover and which I believe will make more clear the details you already have in your possession.
I will explain to you how to use the model: Secure a bomb arming solenoid. Type Al, Specification 24753, 24 volts, manufactured by J. P. Seeburg Corporation, Chicago, Illinois. The Army Air Force has this type solenoid. The model is provided with two flanges, which is No. 1 and No. 2. Mount solenoid cannon plug into No. 1, let the name plate of the solenoid up, fasten solenoid to No. 2. Then solenoid will be in an angle position. No. 3 and 4 hole to mount plate on bomb rack. No. 5 is to look facing the nose of the plane. No. 6 is facing tail on bomb rack; No. 7 bottom of plate; No. 8, top of plate. The plate can be manufactured with larger flanges, also with right and left hand turn and could be used up side down.
After making a demonstration with this model you can see the saving and elimination of all the connections, shown on Drawing No. 2, which is No. 9.
I trust this explains the whole operation fully, and that I may hear from you soon. Many thanks for your kindness.
*834 On December 13, 1943, National Inventors Council replied as follows:
On receipt of your letter of October 7, 1943, we took the entire matter up with the Air Force again and they have commented as follows:
“Using the model submitted by Mr. Fulmer, a trial installation in a bomb rack, incorporating Mr. Fulmer’s proposal, was attempted. A careful review of the drawings and the correspondence in the file indicates that Mr. Fulmer must have based his impressions on a bomb rack on some special installation rather than on the conventional AAF bomb racks. The mounting bracket which Mr. Ful-mer submitted as a sample is not readily applied to a conventional bomb rack and no advantage can be seen in its use. No present military value can be attached to the suggested modification.
In view of the above comments, it is recommended that no further action be taken on the subject suggestion on behalf of the Army Air Forces. Mr. Fulmer’s interest in offering his suggestion is, however, appreciated, and it is desired to commend him for his efforts.”
In view of the negative results set out above, no further investigation of the suggestion appears warranted and we will return your sample to you after January 1, 1944 as we have been requested by the Postmaster not to mail any packages of this nature during December because of the Christmas rush.
I am directed by the Council to thank you for your interesting contribution, and to assure you that any future suggestions will be most welcome.
On December 22, 1943, National Inventors Council advised claimant as follows:
This will acknowledge your letter of December 16, 1943.
The Army Air Forces have twice carefully investigated the suggestion to which you refer. It is not seen how anything would be gained by bringing it to their attention a third time. Technical personnel now engaged in important research and development work should not be diverted to continued reexamination of ideas which appear to be relatively unimportant and unpromising.
*835 Your reference to presentation of the proposal through your Congressman has been noted. There is, of course, no objection to your seeking such an additional channel but it is not seen how such action will affect in any respect the findings of the Air Forces with regard to the merits of the device.
Correspondence relating to claimant’s bracket and of the general character noted hi finding 27 above continued over a period of about ten years.
34. The trial of this case produced no satisfactory proof that the Government ever used claimant’s unpatented bracket mounting solenoids, and no proof that there was ever any agreement with claimant, oral, written or implied, of intended use or of a promise in any way by the Government or any official thereof to compensate claimant for the submission of an idea or suggestion relating to brackets. The evidence of record reveals no basis, either legal or equitable, for compensating claimant for the submission of general and vague suggestions which were not used by the Government.
35. On March 28,1955, Major General J. W. Kelly, USAF, Director, Legislative Liaison, wrote Congressman George Huddleston, Jr., as follows:
I refer to your recent expression of interest in behalf of Mr. Frederick P. Fulmer concerning his allegation as to the use by the Air Force of various designs invented by _ him. Mr. Fulmer’s letter deals with inventions which he claims to have made with regard to a mounting bracket, an oxygen warning circuit system, a camouflage parachute, and an automatic firing circuit for antiaircraft guns.
_ Over a substantial period of time there has been considerable correspondence with Mr. Fulmer by various offices in the Air Force relative to his claim for compensation. In each instance he has been advised that in the absence of a patent or an application for a patent with officially allowed claims therein, no consideration could be given the matter of his claim.
Mr. Fulmer’s referral of a design for a bracket to be used in attaching bomb arming solenoids dates back to 1943. Investigation disclosed that his alleged invention consisted of a sheet metal bracket which would normally have been prepared by any metal worker as *836 conventional shop practice. Because of a change in the design of the solenoid prior to the receipt of Mr. Ful-mer’s suggestion, the bracket had no application to Air Force equipment.
As to the oxygen warning system, Mr. Fulmer was advised under date of 13 September 1943 that the system was not applicable to Army Air Force equipment and would offer no improvement over the present system which was then installed in aircraft of the Army Air Forces. This system has not be[en] adopted by the Air Force as part of the standard equipment on any aircraft.
With respect to Mr. Fulmer’s idea concerning a camouflaged parachute, the Air Force was advised by Mr. Fulmer m 1949 that he had registered a drawing of a parachute under the provision of the Copyright Act. Further, on 28 March 1947, Mr. Fulmer had filed a suit in the Court of Claims to recover compensation for the alleged use by the Government of an unpatented invention for camouflaging parachutes. The suit was dismissed by the Court (77 U. S. P. Q. 532) in view of the fact that Mr. Fulmer had not alleged facts sufficient to show that he had a contract with the Government within the jurisdiction of the Court of Claims and that the use by the Government of his unpatented device or method did not constitute the basis for a suit under the Royalty Adjustment Act or the Air Corps Act of 1926, as amended.
The Air Force has no record of Mr. Fulmer’s idea relating to an automatic firing circuit for antiaircraft guns. The National Inventors Council has advised that Mr. Fulmer submitted this idea to them in 1952. The Council corresponded with Mr. Fulmer on several occasions to the effect that his disclosure was not given in sufficient detail to enable them to properly evaluate the idea. On 2 June 1952 the National Inventors Council wrote Mr. Fulmer to the effect that it was apparent that he merely had a general concept of a photoelectric cell system for automatically firing antiaircraft guns. He was further informed that in this particular field of endeavor, such systems must necessarily have specific features to warrant consideration. Consequently, the National Inventors Council considered the matter closed and would take no further action.
It is not believed that recent circumstances have in any way affected the position repeatedly taken by the Air Force that Mr. Fulmer must have a patent or at *837 least an application for a patent with, officially allowed claims before his claim for compensation can be considered.
No evidence was presented at the trial of this case tending to refute or modify any of the factual statements contained in the above letter.
36. At the trial, Wade Koontz, mentioned by name in claimant’s petition, formerly Chief, Patents Division, Army Air Force, and now Chief, Patents Division, Office of The Judge Advocate General, Department of the Air Force, confirmed his previous statement that, to his knowledge, the United States Air Force has never used any one, or any portion, of claimant’s four suggestions involved in this litigation.
37. At the trial, John C. Green, engineer of National Inventors Council 1944-1945, and since 1945 the Director of the Office of Technical Services of which the National Inventors Council is a division, confirmed his previous statement that National Inventors Council has never used any one, or any portion, of claimant’s four ideas involved in this litigation, and has never recommended their use to any other branch of the Government, and that he does not know of any use of any of said ideas by any branch of the Government.
38. Both Mr. Koontz and Mr. Green stated that neither they nor the National Inventors Comicil did, or had authority to, enter into any contract, express or implied, oral or written, with claimant in any manner obligating National Inventors Council or any branch of the Government to compensate claimant for any of claimant’s four suggestions involved in this litigation.
CONCLUSION
The nature and character of claimant’s demands against the United States are neither legally nor equitably sustainable. Claimant demands compensation for the submission to and/or use by, the United States of four unpatented suggestions. There is no evidence of any contract between claimant and any branch or officer of the United States Gov *838 ernment, either written, oral, or implied, with respect to any one of said suggestions.
Had claimant’s petition, been filed independently of the present congressional reference his claims would have been barred by the applicable statutes of limitation (28 U. S. C. 2401 and 2501). Irrespective thereof, the court is without jurisdiction of these claims at law under 28 TJ. S. C. 1498 (in the absence of patents on claimant’s suggestions), or under 28 U. S. C. 1491 (in the absence of a contract, express or implied, with the United States), and in the absence of proof of use by the Government there is no basis for judgment for claimant under the Air Corps Act (10 U. S. C. 310 (i) and (r)) for unauthorized use of unpatented components of aircraft. There is no other applicable act under which this court could entertain jurisdiction of claimant’s demands either at law or in equity except for 28 U. S. C. 1492 and 2509 under which the demands were referred to this court by the aforesaid House Resolution.
This court has twice previously denied claimant’s demands at law for compensation for the alleged use by the Government of claimant’s alleged colored parachute suggestion, and there is no evidence of governmental use of said suggestion since the time of the court’s aforesaid denials rendered June 1, 1948, and April 8, 1952, which are reported, respectively, at 111 C. Cls. 591, and 122 C. Cls. 195. At law those decisions and denials would be res judicata with respect to this one of claimant’s four present demands if based on a suit independently of said resolution and the statutory provisions regarding congressional reference cases.
Since there are no bases for actions at law for any of claimant’s four demands, the court concludes that there is no legal liability on the part of the Government with respect to the allegations upon which those four demands are predicated.
The court, therefore, next confines its conclusions to the question of whether the Government is equitably liable to claimant in any of the four respects.
Since just prior to World War II, the National Inventors Council of the Department of Commerce has, in accordance with its established purpose, encouraged the public to submit *839 suggestions and ideas which may be considered of military value in the national defense. Claimant was one of the many thousands of patriotic citizens who forwarded suggestions to the Council for military evaluation. Claimant was advised by the Council, through its bulletins and circulars, that it and its technical staff serve as a clearing house for and acts in an advisory capacity to the defense departments with respect to such suggestions as may be submitted, and that each suggestion submitted would be evaluated by technical experts of the National Inventors Council and if deemed of military value it would be transmitted to proper authorities of the defense departments for possible consideration.
The National Inventors Council further advised the public and particularly those who submitted suggestions, that it would receive the suggestions solely for the purpose of determining their military or naval value; that receipt of suggestions by the Council does not legally obligate the United States Government,; that no patent or other rights are secured by submitting suggestions or inventions to the National Inventors Council; that if a suggestion is adopted by a military branch of the Government the matter of compensation and acquisition of rights must be arranged between the party submitting the suggestion and the branch of service that adopts the same; and that the National Inventors Council has no authority to consider the question of compensation for the use of a suggestion by any agency of the Government to which the Council transmitted the idea for consideration.
It was under the foregoing conditions, known to claimant, that the Council received and evaluated claimant’s suggestions. In each of the four instances here involved, the Council advised claimant that his suggestion lacked novelty or lacked advantage over equipment already in use or that it had no military value. The Air Force and Army similarly rejected each of the four suggestions and denied use and intended use of each thereof.
The court therefore concludes that as a matter of equity plaintiff is not entitled to recover on the four claims presented.